JOSEPH GARON *et al. vs.* CREDIT FONCIER CANADIEN.

DECEMBER 18, 1914.

PRESENT: Johnson, C. J., Parkhurst, Vincent, and Baker, JJ.

*(1)   Corporations.   Agency.   Agreement to Repurchase Stock.*

A contract with a corporation through its agents authorized to sell its capital stock, by which it agreed to repurchase the stock upon certain conditions, as the inducement of the sale, is an indivisible contract, and where the corporation has received the purchase price and applied it to its own purposes, it cannot reject the provision to repurchase as being made in excess of the authority of its agent.

ASSUMPSIT.   Heard on exceptions of plaintiff and sustained.

VINCENT, J.   The plaintiffs have brought suit against the defendant corporation in the Superior Court alleging that in April, 1910, they entered into an agreement with the defendant for the purchase of 2,100 shares of the stock of that corporation at one dollar per share; that in consideration of such purchase and prior to the issuing to them of certificates of stock and the payment of the money therefor the said corporation agreed in writing that it would at any time after one year from the 27th day of April, 1910, upon thirty days' notice in writing, repurchase from the plaintiffs

the said shares of stock in the event that the plaintiffs should desire the money for the purpose of constructing buildings or for other good and worthy reasons; that in pursuance of this agreement to repurchase on the part of the defendant, the plaintiffs paid over to the defendant the sum of $2,100 in cash; that on the 23rd day of May, 1911, the parties plaintiff and defendant entered into another agreement in writing which was to be substituted for the first agreement whereupon the said defendant corporation agreed to repurchase the said 2,100 shares of stock in two installments of 1,050 shares each on the first days of October, 1911, and January, 1912, respectively, together with interest at the rate of 4 per cent.; that on the 28th day of October, 1911, in pursuance of the last named agreement, the defendant corporation repurchased 500 shares, paying to the plaintiff therefor the sum of $500; and that said corporation has refused to purchase the remainder of said shares in accordance with its agreement.

It appears that in January, 1910, a Mr. Brouillard, who was an agent of the defendant corporation, sold to the plaintiffs 100 shares of the capital stock of the defendant corporation, the price therefor being one dollar per share; that sometime in April, 1910, a Mr. Leberge, the vice-president of and a director in the defendant company, together with Mr. Brouillard before mentioned, came to the plaintiffs and sought to sell them 2,000 shares of the capital stock of the defendant corporation, but the plaintiffs declined to make such a purchase; and that Mr. Leberge then requested the plaintiffs to loan the defendant company the sum of $2,000 to which the plaintiffs assented, Joseph Garon, one of the plaintiffs, giving Mr. Leberge the sum of $100 on account, taking a receipt therefor. On the day following, the plaintiff Malvina Garon paid to Mr. Leberge the further sum of $1,900, making $2,000 in all. A few days after this last named payment, the plaintiffs received the following communication:

"PROVIDENCE, R. I., April 27, 1910.
"MR. AND MRS. JOSEPH AND MALVINA GARON,
      "160 Suffolk St.,
            "Fall River, Mass.
"DEAR SIR AND MADAM,

"In consideration of your subscription for the capital
stock of our company, the Credit Foncier Canadien pledges.
itself to repurchase at any time after one year from this
date, all the shares which you hold in this company, after
thirty days' notice in writing, after one year from this date.
*Provided, however,* that your request for money, or offer of
your said shares be based on the need that you might have
of this money for purposes of constructing buildings or
other good and worthy reason.

                        "Yours,
                  "CREDIT FONCIER CANADIEN,
                        "JOSEPH E. BROCHU, *Pres.*
                        "C. A. FORREST, *Tres.*"

A year from the date of this communication the plaintiffs
visited the office of the defendant corporation in Providence
for the purpose of getting the money for their stock.    The
defendant, through its treasurer, informed the plaintiffs
that there were no funds available at that time from which
such a payment could be made, but that he would pay them
their money during the winter with interest, one-half to be
paid in October and the other half in January.    The plain-
tiffs having signified their willingness to accept this new
arrangement, the following memorandum agreement was
entered into:

                  "PROVIDENCE, R. I., May 23, 1911.
"MR. AND MRS. JOSEPH AND MALVINA GARON,
      "160 Suffolk St.,
            "Fall River, Mass.
"DEAR SIR AND MADAM,

"The Credit Foncier Canadien pledges itself to repur-
chase your shares on the following terms:    We will repur-

chase 1,050 shares October first, 1911, and the balance which is 1,050 shares January first, 1912. We further pledge ourselves to pay you four per cent. (4%) interest starting from May 1st, 1910. We will repurchase these shares at par value.

"CREDIT FONCIER CANADIEN,

"ARTHUR C. L. ROY, *Tres.*

"We accept the conditions hereinabove mentioned,

"Witness:                          "JOSEPH GARON,

"J. B. DAUDELIN.              "MRS. MALVINA GARON."

Subsequently, on October 23, 1911, the defendant corporation, apparently in pursuance of its last named agreement and in partial performance of its obligations thereunder, paid to the plaintiff the sum of $500, taking a surrender of stock to that amount.

This arrangement was carried out by the surrender on the part of the plaintiffs of one of the certificates for 1,000 shares and the receipt by them of a new certificate for 500 shares and $500 in cash. There were issued altogether to the plaintiffs five certificates of stock, two for 41 shares each, one for 18 shares, and two for 1,000 shares each.

The defendant, while not disputing the contract which its representatives made with the plaintiffs in the sale of its stock, contends that such contract is not binding upon it: (1) because the board of directors was the only body vested with the power to make or authorize such a contract; (2) because the parties attempting to make such contract had no express authority to enter in to the same from such board; (3) because the making of such contract was expressly prohibited by the by-laws of the defendant; (4) because they had no implied authority to make such contract; and (5) because such contract or agreement was never ratified by the directors.

(1) It seems to us that the contract to sell to the plaintiffs shares of stock in the defendant company and the agreement of the defendant, through its agents, to repurchase

such stock under certain terms and conditions, as the inducement of the sale, must be considered as an indivisible contract. It is not claimed by the defendant that the sale of the stock was unauthorized or in contravention of any regulation, by-law or vote of the company or its directors, but that such agents only lacked authority when they affixed to such sale the condition which they did. The evidence shows a partial execution of the contract of repurchase by the acceptance of 500 shares and a payment therefor. It is not disputed that the surrender of such shares and the payment therefor was in pursuance of the agreement of repurchase originally made with the plaintiffs by the defendant's agents.

In the case of *Adam* v. *New England Investment Co.*, 33 R. I. 193, the plaintiff was the owner of certain shares of the capital stock of the American Pickling Company. The defendant company was authorized to acquire the stock of other corporations; had purchased some of the stock of the pickling company and later, by a vote of its directors limiting the price to $45 per share, proceeded to purchase all of its available stock. The president of the defendant company, who was also its general manager, and a director, entered into negotiations with the plaintiff for the purchase of her stock in the pickling company and finally concluded an arrangement with her by which the plaintiff should deliver to the defendant company all her shares of stock in the pickling company, receiving therefor a certain number of shares of the capital stock of the defendant company. This agreement, however, was coupled with a further agreement and understanding that the defendant corporation would redeem and purchase from the plaintiff her shares in the defendant company, at the price of $2.50 per share, at any time after six months from the date of the transfer to the defendant of her shares in the pickling company. This deal was carried out, the plaintiff surrendering her shares in the pickling company, to that company, which in turn issued and delivered to the defendant com-

pany a certificate covering the same which the defendant company accepted and retained. . After the expiration of six months from the date when the plaintiff's shares in the pickling company had been transferred to the defendant, the plaintiff in pursuance of the defendant's agreement to purchase her stock, presented to the treasurer of the defendant company her certificate for 1,520 shares and requested payment for the same at the price agreed upon. The defendant company accepted 320 shares, paying her the stated price therefor and giving her a new certificate for 1,200 shares. Upon two other occasions, subsequently, the defendant company, through its treasurer, received a surrender of stock from the plaintiff, each time paying the price per share agreed upon and issuing a new certificate for the balance until the number of the plaintiff's shares was reduced to 900, after which the defendant, though requested by the plaintiff, refused to take any more of the plaintiff's stock and pay her for the same.

In redeeming the several portions of the plaintiff's stock the same had been paid for from the funds of the defendant company either by checks made or endorsed over by some of its officers and the several new certificates of stock issued to the plaintiff were properly signed and countersigned by the duly authorized officers of the company. The stockholders of the company never passed any vote ratifying the repurchase of the plaintiff's stock nor did the board of directors ratify such repurchase by any formal vote.

The Adam case is therefore practically identical with the case at bar upon the question of the indivisibility of the contract. In that case this court held "that the sale of the defendant's stock to the plaintiff was made upon the express condition of repurchase of the same by the defendant for a fixed price and at a fixed time; that the transaction constituted a conditional sale, and an indivisible contract; that the same was not *ultra vires;* and that the plaintiff has a right to recover for the value of the stock remaining in her hands, at the agreed price of $2.50 per share."

In the case of the *Fremont Carriage Mfg. Co.* v. *Thomsen*, 91 N. W. 376 (Neb.), it was held that "A contract with a corporation by which it sells certain of its shares of stock, and agrees to repurchase the same upon the happening of a certain specified event, is not *ultra vires;* and for a breach thereof the purchaser may recover of the corporation the amount agreed upon as the price of such repurchase."

Also in the case of *Lumber Company* v. *Foster*, 49 Iowa, 25, where the president, by letter, had agreed that the corporation would purchase Foster's stock in case he ceased to be its secretary and treasurer, the court held that the contract was not *ultra vires*, and that Foster was entitled to recover the value of his stock. See, also, *Browne* v. *St. Paul Plow Works*, 62 Minn. 90; *Vent* v. *Duluth Coffee & Spice Company*, 64 Minn. 307; *Chapman* v. *The Iron Clad Rheostat Company*, 62 N. J. L. 497.

In *Mulford* v. *Torrey Exploration Co.*, 100 Pac. 596, it was held by the Supreme Court of Colorado that a statute prohibiting corporations from purchasing their own stock did not prevent a corporation from selling its treasury stock on condition that the buyer might rescind; the transaction constituting a conditional sale and indivisible contract.

In the case at bar there is no dispute but that Brouillard and Leberge were the agents of the defendant company to dispose of shares of its capital stock, and that in the exercise of that authority they sold certain shares to the plaintiffs. The defendant received the money arising from such sale, applied it to its own purposes and now contends that it has the right to ignore that part of the contract which relates to repurchase on the ground that its agents exceeded their authority in adding that condition, notwithstanding the fact that it may have served as the culminating inducement which led the plaintiffs to part with their money in exchange for the stock of the defendant company. We cannot accept this view of the defendant.

An indivisible contract, as the phrase implies, is a contract whose constituent parts cannot be separated. Therefore, there are only two courses open to the defendant. It must accept the contract as a whole or reject it as a whole. If accepted the defendant must repurchase the stock. If rejected the defendant must return the money to the plaintiffs. *Porter* v. *Plymouth Gold Mining Co.*, 29 Mont. 347. In the present case both ways lead to the same result as far as the parties thereto are concerned. The plaintiffs have rights which cannot be ignored. They seem to have purchased the stock in good faith from an agent of the defendant company, admittedly invested with the power to sell and apparently authorized to fix the conditions of the sale. We think the plaintiffs are justified, under the circumstances, in demanding the repurchase of the stock, the condition of the original sale being within the apparent scope of the agent's power. *Smith* v. *Droubay*, 20 Utah, 443; *Parker* v. *Crilly*, 113 Ill. App. 309. In the latter case, it was held that when it appears that at the inception of the transaction an agent is authorized in respect thereto a presumption arises that such authority continued throughout the subsequent stages.

The plaintiffs refused, in the first instance, to purchase the stock and it was only after the suggestion of the defendant's agents that the plaintiffs loan the money and the condition of repurchase added that the plaintiffs finally agreed to take the stock. It is far from improbable that the plaintiffs regarded the whole transaction more as a loan of money to the defendant than an absolute and unconditional purchase of stock. It seems clear, under the authorities, that the contract made with the plaintiffs is indivisible; that the defendant cannot reject one part of the contract and retain the benefit of the other. This being so it seems unnecessary to discuss the disputed question as to the subsequent ratification of the contract on the part of the defendant's officers and directors. Our conclusions being based upon the law and the undisputed facts, we think that

the plaintiffs are entitled to recover the amount claimed for the balance of the shares now remaining in their hands; that the plaintiffs' exception to the direction of a verdict for the defendant should be sustained; and that the case should be remitted to the Superior Court with direction to enter judgment for the plaintiffs.

The defendant may appear before this court on the 11th day of January, A. D. 1915, at 10 o'clock A. M., and show cause, if any it has, why this case should not be remitted to the Superior Court with direction to enter a judgment for the plaintiffs for $1,600, together with costs and interest.

*Archambault & Archambault, Severin M. Lamarre,* for plaintiffs.

*Archambault & Jalbert,* for defendant.